IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONUMENT BUILDERS OF | : | CIVIL ACTION |
| PENNSYLVANIA, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN CEMETERY ASSOC. et al. | : | NO. 84-3014 |

MEMORANDUM

Dalzell, J.                                    May 24, 2007

On August 5, 1988, Monument Builders of Pennsylvania, Inc., a trade organization of independent sellers of cemetery monuments, entered into an agreement (the "Settlement") on behalf of its members with the Cemetery Association of Pennsylvania and its members to resolve their then-four-year-old antitrust dispute.  The original suit alleged that the cemeteries engaged in a variety of practices forbidden under the Sherman Act that had the effect of preventing the independent monument dealers from competing with them for the lucrative business of selling headstones, grave markers, and other cemetery memorials.  The Settlement imposed a variety of conditions on the parties in an attempt to ensure that cemeteries and independent dealers could compete for business on a level playing field.

In the nearly twenty-year life of the Settlement (which has _no_ terminus), various monument dealers have brought motions to enforce its terms, alleging that one cemetery or another has somehow violated the agreement.  It is one such motion, filed more than six years ago, that we address here.

**Design Monuments' Allegations**

The parties to this motion are Design Monuments Company, an independent monument dealer, and Jefferson Memorial Park, a large cemetery in Allegheny County, Pennsylvania.  Design alleges four violations of the Settlement.

Design's first claim is that Jefferson's care fee[1] structure runs afoul of the Settlement.  Pennsylvania law requires cemeteries to deposit certain funds in a permanent lot care fund, 9 Pa. C.S.A. §§ 301-303, and requires such funds to be maintained in trust for the perpetual care of the lot and grounds, id. §§ 305, 307.  In addition to "trusting" (the industry term) 15% of the sale price of each lot as state law requires, Jefferson charges two additional fees relating to the memorial plaque placed on the lot.[2]  The first, which Jefferson calls the "Endowment Care Fee", is a trusted fee that covers leveling and repairing the marker itself.  Hearing Transcript ("HT") at 121:21-122:13.  The other fee, the "Additional Memorial and Lot Care Fee,"[3] is a non-trusted fee that covers the additional leveling required during the first five years after installation while the marker settles.  HT at 122:16-123:6.  Design alleges that this fee structure violates the Settlement.

---

[1] Care fees are those a cemetery charges at the time of sale to ensure that the grave site and monument are properly cared for in perpetuity.

[2] Jefferson does not allow headstones, so all the markers at the cemetery are granite pieces on a concrete foundation, usually with a bronze plaque affixed, that are set into the ground.

[3] Some cemeteries refer to this as an "early care" fee.

Design's second claim is that Jefferson's layout and inspection fee is excessive.  As of the hearing date (February 27, 2007), Jefferson charged a $120 fee for layout and inspection of a monument that an outside dealer installs.  The amount of this fee is based on two time studies that Jefferson conducted to determine how much time its staff spends laying out the plot before monument installation and inspecting the plot after installation is complete.  Design contends that this fee is excessive under the Settlement.

Next, Design alleges that Jefferson improperly prohibits independent monument dealers from using the same type of equipment that Jefferson itself uses to install markers.  Jefferson prohibits dealers from driving "any motor vehicles (trucks, cars, pickups, etc.) on the turf."  Pl. Ex. 12. ¶ 5(b).  The markers, once they have been attached to their concrete backers, are very heavy and it can be difficult to maneuver them from the roadway to the grave site.  Jefferson has a small, custom-built four-wheel-drive machine that it uses for this purpose.  Design contends that Jefferson's restriction on motor vehicles violates the terms of the Settlement.

Finally, Design contends that Jefferson impermissibly bundles its prices when it quotes them to customers.  In particular, the claim is that the Settlement does not allow Jefferson's inclusion of the layout and inspection fee in the complete installation charge.

We will examine each of these allegations in detail in the sections that follow.

**Care Fees**

The Settlement makes specific references to two care fees that cemeteries may charge.  <u>See</u> Settlement ¶¶ 6(b)(7)-(8). The first is a "one time fee" for "lot care on lots where foundations and/or memorials are installed." <u>Id.</u> ¶ 6(b)(7).  The Settlement requires that this fee must be "placed in the perpetual care trust fund." <u>Id.</u>  The second is "a one time additional fee for the care of a memorial and lot where a memorial is installed including resetting during the initial period after a memorial is installed." <u>Id.</u> ¶ 6(b)(8).  The Settlement makes no mention of a requirement that this second fee be placed in the perpetual care trust.

Judge Troutman, in his memorandum of May 27, 1998 in this case addressing the dispute between B. Reibstein Memorial Art Monument Company and Roosevelt Memorial Park ("<u>Reibstein</u>"), applied the trust requirement of paragraph 6(b)(7) to the fee in paragraph 6(b)(8) because paragraph 8 requires that memorial care charges be in the manner provided in paragraph 6(b)(7) and 6(b)(8).  <u>See</u> <u>Reibstein</u> at 23.  Since paragraph 8 implies that the two fees are to be handled in the same manner, Judge Troutman reasoned, they must both be trusted.

We must respectfully disagree with our late colleague's construction of the Settlement.[4]  We do not think it a reasonable reading of a contract that an explicit difference (here the question of whether the additional fee must be trusted) in the

---

[4] Since neither Design nor Jefferson was a party to the <u>Reibstein</u> motion, Judge Troutman's decision has no <u>res judicata</u> effect here.

4

text of two adjacent paragraphs is erased by a cross-reference seven pages later in the agreement.  We thus read 6(b)(7) and 6(b)(8) as allowing two separate fees, one of which must be trusted and the other of which need not.

Design argues that the Settlement permits only one fee, Pl. Mem. at 4, but this is contrary to both the plain meaning of the text itself[5] and to Judge Troutman's analysis of it.  See Reibstein at 22 ("[T]he Monument Builders agreed not to oppose two 'second care' fees relating to lot care and to care of memorials and foundations.") (emphasis added).

Design further attacks the Additional Memorial and Lot Care fee on the grounds that, because the dealer is required to re-level the memorial for the first year, the dealer is being required to pay Jefferson for performing a service that it must perform itself.  This claim fails on our examination of the underlying facts.  First, the dealer is not responsible for all maintenance during the first year, but is only required to re-level the memorial if "Jefferson believes [the need for leveling] is due to a faulty installation."  Pl. Ex. 12 ¶ 5(k).  Design presented no evidence as to how often Jefferson determines that a need for re-leveling in the first year is due to "faulty installation".  Second, the Additional Memorial and Lot Care fee covers a period of five years, HT at 122:24, whereas the dealer need only re-level the monument for the first year.  Although there may be some overlap between the purpose of the Additional

_____

[5] We see no other way to explain the use of the word "additional" in paragraph 6(b)(8).

Memorial and Lot Care fee and the requirement that dealers sometimes re-level monuments they have installed, Design has failed to show that "Jefferson is imposing a fee for which neither Design Monument, nor the customer, receive any value or consideration."[6]  Pl. Mem. at 6.

Design also claims that Jefferson violates the Settlement when it charges these lot care fees directly to the monument dealer rather than to the purchaser of the memorial. The agreement that Jefferson requires of all independent monument dealers states, "[t]he Independent Seller/Installer agrees to remit to Jefferson the amounts published for Endowment Care, Additional Memorial and Lot Care,... and layout and inspection on or before the day of installation."  Pl. Ex. 12 ¶ 6.  There is no doubt that this requires payment from the dealer.  The Settlement allows these fees to be charged to the cemetery's "customers." Settlement ¶¶ 6(b)(7)-(8).  "Customer" is not a defined term in the Settlement, but we think it most reasonable to read it as referring to the lot purchasers, not to the independent monument dealers.

Design is correct that a cemetery may not "[c]harge the Dealer for fees of any nature . . . except as specifically provided in [the Settlement]."  Settlement ¶ 7(i).  Because the Settlement only allows the lot care fees to be charged to "customers," we find that the Settlement allows a dealer to

---

[6] It is also far from obvious that the Settlement requires that the dealer or the customer receive any value or consideration for a particular fee, so long as the fee is one of those the Settlement authorizes.

require Jefferson to charge that fee directly to the lot
purchaser.  We note, however, that such a requirement is unlikely
to have any pro-competitive effect.

Because the dealers pass any fees the cemetery charges
them through to the monument purchasers, H.T. at 16:5-20, there
is no direct cost to the dealer for the lot care fees.  A
requirement that Jefferson charge the lot care fees directly to
the lot purchaser would require a customer who purchased a
monument from an outside dealer to pay both Jefferson and the
monument dealer for monument installation.  Since a customer who
purchased a monument directly from Jefferson would only need to
pay Jefferson, such a requirement would seem to discourage the
use of outside monument dealers.

Further, since Jefferson will not allow an outside
dealer to install a monument when the lot owner owes money to the
cemetery, Pl. Ex. 12, ¶ 5(f), such an arrangement could put the
monument dealer in the awkward position of having to act as a
debt collector for Jefferson in order to complete its
installation.  Nevertheless, should Design (or any other dealer
who is a member of the settling class) wish to require Jefferson
to charge the lot care fees directly to the lot purchasers, it
may do so.

**<u>Layout and Inspection Fee</u>**

Design's second allegation is that Jefferson's layout
and inspection fee exceeds what the Settlement authorizes.  The
Settlement allows a cemetery to charge "a fee based on its actual
costs and overhead in accordance with general accounting

principles, including a reasonable profit, to lay-out where
layouts are performed, and to inspect the work product of Dealers
of memorial foundation and installation services."  Settlement ¶
7(g).  The actual costs are defined to include "the hourly
compensation, including fringe benefits, of those employees whose
normal duties include lay-out and inspection of memorials
installed by Dealers."  Id.

     The Settlement does not provide a precise calculation
for the fee.  We find that the phrase "reasonable profit" is
sufficiently elastic to account for considerable variation in the
actual method of setting the price.  What is required, however,
is that the price not be arbitrarily set but bear some
relationship to the cemetery's actual cost.

     The dispute under this same Settlement between Art
Monument and Montefiore Cemetery ("Montefiore") is instructive in
our construction of paragraph 7(g).  See Pl. Ex. 7.  In that
case, we calculated that the relevant cost to perform the service
was $39.38.  Id. at 141.  For a number of years, Montefiore had
charged a layout and inspection fee of $60.00, which is the
approximate result of adding to that cost a 22% overhead and a
25% profit.  When Montefiore tried, without explanation, to raise
the fee to $330.00, Art Monument sought a preliminary injunction.
We found that no interpretation of paragraph 7(g) could justify
charging $330.00 for a service that cost Montefiore less than
$40.00 to perform and granted the injunction.

     Here there are two aspects to Design's challenge to
Jefferson's $120.00 fee.  The first is Design's claim that

Jefferson's costs are exaggerated.  Jefferson's costs are based on a series of detailed time studies, which it has included in the record as its exhibits 8-10.[7]  Jefferson's calculation of the time spent on each installation was based on a document entitled "Components for the Layout & Inspection of Grave Markers."  The cemetery has attached a copy of this document to each year's cost spreadsheet in exhibit 10.

Although the actual layouts are performed by the cemetery foreman,[8] Jefferson's cost analysis includes between twenty-one and twenty-four minutes of tasks that administrative staff in the cemetery office perform.  This work includes reviewing the files to make sure that the customer has no outstanding bills and that there is no confusion about which grave site the monument is to be installed on, as well as

---

[7] It its post-hearing memorandum, Design challenges the validity of these time studies.  The only evidence it offered that these time studies were inaccurate, however, was the deposition testimony of Gregory Havrilla.  He was asked, based on his experience managing a cemetery, how long he believed a layout and inspection should take.  He responded that it required no more than fifteen minutes.  See HT 17:6-18:10.  Because Havrilla's testimony was general and not based on a detailed understanding of Jefferson's layout and inspection process, we are disinclined to weigh it heavily.  Further, even if a layout and inspection could be done in less time, the Settlement does not require cemeteries to do a minimal inspection.  Except as we address below, Design offered no evidence that the time studies overestimate the time Jefferson actually spends doing layout and inspection.  Since the Settlement allows cemeteries to base their fee on actual cost, even if Jefferson actually does a more thorough inspection than Havrilla thinks is necessary, the Settlement entitles it to charge a fee based on the time it actually spends.  Therefore, except as modified below, we will accept their studies as accurate.

[8] For nearly all of the time at issue, this was James Opfer.  Opfer testified in detail at the hearing about Jefferson's layout and inspection process.

providing the foreman with the proper documentation for the layout process.  Jefferson contends that these activities are an integral part of the layout and inspection process.  Def. Mem. at 3-5.  Paragraph 7(g), however, limits costs to "employees whose normal duties include lay-out and inspection of memorials." Although they participate in the process, administrative staff cannot fairly be characterized as laying out or inspecting memorials.  Indeed, Jefferson's own time studies refer to those tasks as "Pre Layout work" and "Post layout work," Def. Ex. 10, locutions that clearly separate those activities from the layout itself.  We find, therefore, that the administrative activities are not fairly included in Jefferson's cost for layout and inspection.

Next, Jefferson's time analysis is based on the assumption that the layout will be done a day before the dealer arrives to install the monument.  This requires a separate trip to the site as well as a return trip to remove the layout pins if the installation is cancelled.  See Def. Ex. 10, notes 6-8. Opfer testified, however, that he usually does the layout while the dealer is at the cemetery and after he takes the installers to the grave site.  HT at 142:4-11.  That means that Jefferson's minimum times are overstated by at least the six minutes spent traveling to and from the grave site to perform the layout since, in a minimal case, the layout will be done on the same trip as reviewing the installation with the dealer.

Further, since most of the layouts are done after the dealer has arrived to install the monument, the effects of last

minute cancellations are overstated.  The Jefferson cost analysis estimates that 15% of installations will be cancelled due to weather and 10% will be voluntarily cancelled by the dealer.[9] The cost analysis assumes that for each of these someone must remove the pins and then perform the layout again once the installation is rescheduled.  Since Opfer testified that the "normal" case was that he did the layout after the dealer arrived, we must assume that more than half of those cancellations produce no additional work for Mr. Opfer.

Jefferson's cost calculations also include an allowance for mileage.  The Settlement is very clear that cost includes only "hourly compensation, including fringe benefits" of employees who perform layouts.  No allowance is made for additional expenses such as mileage or equipment.

Based on the modifications to Jefferson's time studies described above, the cost average Jefferson calculated based on its 2005 marker installations,[10] and the cemetery's 2004 employee cost analysis,[11] we conclude that Jefferson's allowable actual cost for layout and inspection averages $34.54 per marker.[12]

---

[9] Although these percentages seem high, Design offered no evidence to challenge them and so we accept them as accurate.

[10] This is the last of the spreadsheets Jefferson provided in its exhibit 10.

[11] Jefferson did not provide a 2005 employee cost analysis.

[12] Because, in its spreadsheets, Jefferson includes markup in its calculation of cost, we cannot produce a precise figure with which to compare this.  We estimate, however, that Jefferson's calculation of actual cost would result in a figure of about $46.00.

The second part of Design's claim is that Jefferson's markup from its actual cost is excessive.  The Settlement requires only that the layout and inspection fee be "based on" the cemetery's actual cost, overhead, and reasonable profit. Although actual cost is defined, overhead[13] and reasonable profit are not.

As the movant, Design bears the burden of proving that Jefferson's fee does not comply with the Settlement.  Their attempt to shoulder this burden was based primarily on Howard J. Gordon's expert report and testimony.  Based on Jefferson's tax returns from 1999, 2000, and 2001, Gordon calculated Jefferson's average overhead as 29.6% of gross sales.

"In general, overhead 'may be said to include broadly the continuous expenses of the business, irrespective of the outlay on a particular contract.'"  Vitex Mfg. Corp. v. Caribtex Corp., 377 F.2d 795, 798 (3d Cir. 1967) (quoting Grand Trunk W.R.R. Co. v. H.W. Nelson Co., 116 F.2d 823, 839 (6th Cir. 1941)).  In a similar vein, Black's Law Dictionary (6th ed.) defines overhead as "[a]ny cost not specifically or directly associated with the production of identifiable goods and services."  The purpose of an overhead factor in pricing, then,

---

[13] Although the wording is somewhat ambiguous, referring only to "general accounting principles," it appears that the Settlement requires overhead to be calculated in accordance with generally accepted accounting principles (GAAP). We received no testimony as to what GAAP requires for overhead calculation and -- as we discuss in detail below -- the only calculation we did receive for overhead, that of Howard J. Gordon, is flawed.

is to allow a company to recoup across its entire business any costs that are not fairly attributable to a particular sale.

Gordon calculated Jefferson's overhead by summing certain line items from Jefferson's tax returns.  Neither his report nor his testimony offers specific rationales for the lines he selected or those he did not.  There are several costs that would seem to meet the definitions above, however, that Gordon's analysis omits.  Gordon's calculation did not, for example, include in overhead any employee benefits or any salary allowance for clerical staff.  Design has argued, and we have agreed above, that expenses for clerical staff should not be included in actual cost.  If these employees do not represent actual cost for purposes of layout and inspection, however, they must be overhead.  Cf. Vitex, 116 F.2d at 839 (specifically including "clerical salaries" in the definition of overhead).  If the cost of those employees cannot be recouped through specific fees based on their time, it must be recouped as overhead across the entire business.[14]  Similarly, the cost of benefits Jefferson provides its officers and clerical employees should be included in overhead, but are left out of Gordon's calculation.

While the tax returns alone do not provide enough information to determine with any precision what the overhead rate would be if these items were included, it appears that

---

[14] Similarly, the percentage of James Opfer's time that is not spent on services for which Jefferson is paid by its customers (his time spent supervising other employees or performing general maintenance on the grounds, for example) is also fairly considered overhead.

Gordon's calculation underestimates overhead by as much as one-third.[15]

Using the same tax returns, Gordon calculated Jefferson's average net profit as 5.2% of gross sales.

Having calculated the overhead and profit figures, Gordon simply multiplied the actual cost figure by the overhead of 29.6% and the profit of 5.2% and added those amounts to the cost. Because both the overhead and profit figures were expressed as percentages of <u>gross sales</u>, however, multiplying the actual costs by those figures produces a number that has no meaning for our purposes.[16] To use a simplistic example, take a business that has gross sales of $100. If the cost of the goods sold is $50, overhead is $25, and profit is $25, then that would result in a 25% overhead and a 25% profit when expressed as a percentage of gross sales. If we then calculated overhead as Gordon did, we would multiply the $50 cost by the 25% overhead and conclude that the company's overhead was only $12.50, half of the true value. As Jefferson points out in its brief, calculating its prices by such a method would soon drive it out of business. Def. Br. at 11. Because they are so obviously

---

[15] Because we find that -- regardless of how Gordon calculated the overhead percentage -- his application of that percentage renders his overall report almost meaningless, we need not concern ourselves with reaching a precisely correct value for Jefferson's overhead.

[16] While we approved a similar calculation in <u>Montefiore</u>, it appears that either the overhead and profit were calculated by some different method in that case or Montefiore did not challenge the validity of the calculation.

14

flawed, we cannot afford Gordon's calculations any weight in our analysis.

In the absence of Gordon's testimony, we are left with no basis for concluding that Jefferson's fee results in an unreasonable profit. Harry Neel, the President and CEO of Jefferson, testified that the company's markup on markers was over three times. HT at 109:17-19. Even operating from the reduced cost we calculated above, a layout and inspection fee of $120 represents a multiple of 3.47 times cost, apparently consistent with Jefferson's general pricing strategy.[17] On this record, we are unable to say that Design has carried its burden of demonstrating that this violates the Settlement.[18]

**Use of Equipment**

Design's third claim is that Jefferson impermissibly bars monument dealers from using equipment similar to that which Jefferson itself uses to install markers. When Jefferson performs installations itself, it uses a small, motorized vehicle to carry the marker from the roadway to the grave site. HT at 151:21-25. There was conflicting testimony at the hearing about whether Jefferson would allow independent dealers to use a

---

[17] It is of very limited relevance that Havrilla testified that Design uses a markup of between two and three times. See HT at 30:12-19. Jefferson is under no obligation to use the same markup as its competitors. So long as its markup on the layout and inspection fee is not grossly different from its markup on the other goods and services it sells, we cannot say that Jefferson's actions are anti-competitive or contrary to the terms of the Settlement.

[18] The situation here is a far cry from that in Montefiore where the cemetery sought to charge a fee that was more than eight times its actual cost.

15

similar machine for installations.  James Opfer testified that
Jefferson would "absolutely not" permit an outside supplier to
come in with similar machinery.  HT at 152:6.  Harry Neel
testified that Jefferson "ha[s] allowed and will allow any marker
dealer that has comparable light weight equipment to use it on
our turf."  HT at 92:14-16.

Jefferson's installation agreement with independent
dealers requires each dealer to certify that it "will not drive
any motor vehicles (trucks, cars, pickups, etc.) on the turf,
sidewalks or any area not designated and paved as a roadway."
Pl. Ex. 12 ¶ 5(b).  Design believes that this restriction covers
a vehicle such as the one that Jefferson uses.  See HT at 12:17-
23.

We read the installation agreement as restricting
dealers such as Design from using equipment like that Jefferson
uses.  The equipment at issue is clearly a motor vehicle, and a
dealer subject to that agreement would reasonably believe that it
was not permitted to drive such a vehicle over the turf.  Even
though Neel testified that he has made exceptions for dealers in
the past and would do so in the future, the agreement places a
clear restriction on the activities of independent dealers.

That still leaves the question, however, of whether
such a restriction violates the Settlement.  There can be no
doubt that the intent of the Settlement was to allow independent
dealers to compete on equal terms with the cemeteries in the sale
of monuments.  The terms of the Settlement are quite specific,
however, and were clearly negotiated with considerable care.

16

Even though Jefferson's restriction on the use of motorized equipment prevents Design from competing with Jefferson on equal terms, "we must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with our own conception of its purpose." Harris v. City of Philadelphia, 137 F.3d 209, 212 (3d Cir. 1998) (citing United States v. Armour & Co., 402 U.S. 673, 681-82 (1971)). "A court should not later modify the decree by interposing terms not agreed to by the parties or not included in the language of the decree." Id.

Design identifies two paragraphs in the Settlement that, it contends, prohibit Jefferson's vehicle restriction. Paragraph 7(b) states that a cemetery may not bar a dealer "from performing work necessary for the installation of the memorial." Although a motorized cart such as that Jefferson uses would be helpful to Design in installing monuments, it is not "necessary," which means "[i]ndispensable, requisite, essential, needful; that cannot be done without." 10 Oxford English Dictionary 276 (2d ed. 1989).[19] Design has successfully installed well over 200 markers at Jefferson without the use of such a vehicle. See Pl. Ex. 20, sch. 5.

Design also contends that paragraph 7(d) bars Jefferson from imposing this restriction on dealers. Paragraph 7(d) says that a cemetery may not "[s]chedule installations by Dealers in a

---

[19] The OED notes that, in the sixteenth and early seventeenth centuries, the use of necessary "freq[uently] approach[es] the sense of 'useful' without being absolutely indispensable." Id. Although lawyers are admittedly prone to archaic usage, we do not think it appropriate to read the Settlement as though it had been written during the reign of Elizabeth I rather than Elizabeth II.

17

manner which is more stringent or burdensome than the manner in which installations are scheduled for performance by the cemetery itself."  But there is no contention here that the <u>scheduling</u> of installations is burdensome.  Were Jefferson to allow dealers to install monuments only after 4:00 or to prohibit them from performing multiple installations on the same day, those restrictions might implicate paragraph 7(d).  Because the restriction Design challenges is unrelated to scheduling, however, paragraph 7(d) is inapplicable.

Design can identify no term of the Settlement that Jefferson has violated by refusing to allow Design to use a small, motorized vehicle for installations.  Their claim must, therefore, fail despite the fact that such a restriction unarguably gives Jefferson an advantage over the independent monument dealers.

**Bundling of Prices**

Design's final substantive allegation is that Jefferson has impermissibly bundled its prices to customers, concealing some of the costs and making it impossible for customers to compare Jefferson's prices with those of the independent dealers.  Paragraph 7(j) prohibits a cemetery from making pre-need[20] sales of memorials "without each item or service being priced separately."  Neel himself testified that the layout and inspection fee is built into Jefferson's total installation fee.

---

[20] This euphemism refers to sales to a living customer for their own use as opposed to sales to the family of someone who has already died.

18

HT at 98:1-7.  Jefferson's invoices confirm that this fee is not separately listed.  See Def. Ex. 6.

Although the Settlement does not define "item or service", we find that this paragraph requires that invoices from the cemetery must at least enumerate those fees that the cemetery charges to independent dealers or to the dealers' customers.  In the case of Jefferson, that would include both endowment care fees and the layout and inspection fee.  All the invoices from Jefferson that have been introduced into evidence, see id., list the endowment care fees, but none lists the layout and inspection fee.  We find that Jefferson's failure to list the layout and inspection fee as a component of the installation price violates paragraph 7(j) of the Settlement.[21]

Because Design does not claim any damages from this violation, we will simply require Jefferson to bring its invoices into compliance with the terms of the Settlement within ninety days of this Order.

## Contempt

Design asks us to find Jefferson in contempt for its violation of the Settlement.  18 U.S.C. § 401(3) allows us, at our discretion, to hold a litigant (or, for that matter, a non-party) in contempt for disobedience of a lawful order of the

---

[21] Design also contends that the fact that the invoice lists the endowment care and installation fees as components of the price of the marker rather than as separate line items represents a separate violation of 7(j).  The Settlement requires that each item or service be "priced separately."  We find that, so long as the cemetery informs the customer of the amount of each of the included fees, that is sufficient to comply with the Settlement.

court.  Even though a consent decree is an agreement of the parties, because a court adopts it and incorporates it into a judgment, a court may use its contempt powers to enforce it. Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 97 (3d Cir. 1981); Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 533 F. Supp. 869, 880 (E.D. Pa. 1982).

Although we may hold a party in civil contempt without a finding that it acted willfully, see id. (citing NLRB v. Local 282, Int'l Bhd. of Teamsters, 428 F.2d 994, 1001 (2d Cir. 1970)), the purpose of civil contempt is purely remedial rather than punitive, see MacNeil v. United States, 236 F.2d 149, 154 (1st Cir. 1956); United States v. Int'l Union, United Mine Workers of Am., 190 F.2d 865, 873 (D.C. Cir. 1951).  Because Design has provided no evidence that it suffered any harm as a result of the minor violations we found[22] and because we have no reason to expect that anything more than our Order today will be required to ensure Jefferson's compliance going forward, we decline to find Jefferson in contempt.

**Attorneys' Fees**

Design's claim for attorneys' fees is predicated on a finding of contempt.  Because we decline to find Jefferson in contempt and Design has presented us with no other basis for a fee award, we must also decline Design's invitation to require

---

[22] Indeed it is difficult to see how either of Jefferson's violations could have harmed Design.  The care fees Jefferson charged were passed through to Design's customers and, even taking into account the layout and inspection fee, Jefferson's installation costs are significantly higher than Design's.  HT at 99:9-19.

Jefferson to pay its fees.  We also note that it is Design, not Jefferson, that allowed this proceeding to drag on for more than six years before coming to resolution.[23]  We find that the requirement that Jefferson bear its own fees (as well as the continuing threat of legal sanction) over that period is a sufficient deterrent, given the technical nature of the violations we have found.

**Punitive Damages**

Design claims that we should impose punitive damages. For the same reasons that we have declined to find Jefferson in contempt, we decline to impose punitive damages.


BY THE COURT:


/s/ Stewart Dalzell, J.

---

[23] Though we most assuredly cast no stone at Design's indefatigable and able counsel, as Jefferson's counsel well put it to us last fall, he was "operating under the assumption that this matter would not be tried and that Plaintiff was no longer interested in pursing the matter."  Ltr. from Brian T. Must to Judge Stewart Dalzell (Oct. 18, 2006).  Perhaps the answer to this mystery lay with the manually kept docket that existed when Design's motion was filed in September of 2000.  As the first ECF entry in this matter was entered on April 3, 2003, it is easy to imagine how gremlins could have kept Design's motion from counsel and the presiding judge for so long.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONUMENT BUILDERS OF          :     CIVIL ACTION
    PENNSYLVANIA, INC.         :
                              :
         v.                   :
                              :
AMERICAN CEMETERY ASSOC. et al. :     NO. 84-3014

ORDER

AND NOW, this 24th day of May, 2007, upon consideration of plaintiff Monument Builders of Pennsylvania's motion to compel compliance with consent decree by defendant Jefferson Memorial Park (docket entry # 336), the response of Jefferson Memorial Park, and the parties' post-hearing briefs (docket entries (docket entries 414 & 415) as well as the testimony presented at the hearing held on February 27, 2007, and upon the findings of fact and conclusions of law articulated in the accompanying Memorandum of Law, it is hereby ORDERED that:

1.   Plaintiff's motion is GRANTED IN PART only as described below;

2.   On request of any settling member of the plaintiff class, Jefferson shall CHARGE the permissible endowment care fees directly to the lot purchaser rather than to the monument dealer;

3.   Within ninety days of this Order, Jefferson Memorial Park shall MODIFY its invoice form so that the amount of all monument endowment care fees and the layout and inspection fee are clearly identified as part of the sale price of each monument; and

4.   In all other respects, plaintiff's motion is DENIED.

BY THE COURT:

/s/ Stewart Dalzell, J.